# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## SOUTHERN RAILWAY COMPANY V. RUSSELL, TRUSTEE, ETC.

### June 15, 1922.

1. CONNECTING CARRIERS—*Liabilities—Section 3926 of the Code of 1919—Interstate Commerce.*—Section 3926 of the Code of 1919, providing for the liability of initial carriers, is not applicable to shipments originating in another State.

2. CONNECTING CARRIERS—*Liability of Initial Carrier—Presumption as to Condition of Goods—Common Law—Carmack Amendment.*—At common law a connecting carrier, who has completed the transportation and delivered the goods to the consignee in a damaged condition or deficient in quantity, will be held liable in an action for the damage or deficiency, without proof that it was occasioned by his fault, unless he can show that he received them in the condition in which he has delivered them. The condition and quantity of the goods when they were delivered to the first of the connecting carriers, being shown, the presumption will arise that they continued in that condition down to the time of their delivery to the carrier completing the transportation and making the delivery to the consignee, and that the injury or loss occurred while they were in his possession. And notwithstanding the provisions of the Carmack amendment of the Interstate Commerce act (34 Sta . at L. pp. 584, 595), under such circumstances, the delivering carrier is liable.

3. STATUTES—*Enactments of Session of 1918 Subsequent to Code of 1919.*—The enactments of the session of 1918, so far as they vary from or conflict with the Code of 1919, are deemed to be subsequent to the Code. Thus, where a judgment was rendered in the Civil Justice's Court of the city of Richmond, August 20, 1919, before the Code of 1919 took effect, and there was an appeal to the Law and Equity Court of the city of Richmond where the case was tried *de novo* and a verdict rendered April 15, 1920, after the Code of 1919 took effect, the rights and liabilities of the parties are determinable by Acts of 1918, page 467, chapter 291, section 3, with regard to the filing of affidavits by the parties in action before a civil justice's court.

4. STATUTES—*Title Embracing More than One Subject—Amendatory Act.*—If the title of the original act is sufficient to embrace the matters covered by the provisions of an act amendatory thereof, it is unnecessary to inquire whether the title of the amendatory act would of itself be sufficient.

5. STATUTES—*Title Embracing More than One Subject—General Rule.*— The constitutional provision that "no law shall embrace more than one object, which shall be expressed in its title" was never intended to hamper honest legislation, nor to require that the title should be an index or digest of the various provisions of the act, and it is rare that the generality of the title is a valid objection thereto. The fact that many things of a diverse nature are authorized or required to be done in the body of the act, though not expressed in its title is not objectionable, if what is authorized by the act is germane to the object expressed in the title, or has a legitimate and natural association therewith, or is congruous therewith, the title is sufficient.

6. STATUTES—*Title Embracing More than One Subject—Doubt Resolved in Favor of Constitutionality.*—If there is doubt as to the sufficiency of the title of a statute, the doubt must be resolved in favor of its sufficiency, as courts will not declare an act of the legislature unconstitutional unless it is plainly so.

7. STATUTES—*Title Embracing More than One Subject—General Rule.*— The title must not be made a cover for surreptitious or incongruous legislation, nor be such as to mislead the legislature or the people, but should fairly state the general subject covered by the body of the act. Subject to these limitations, the generality of the title is not a valid objection.

8. STATUTES—*Title Embracing More than One Subject—Acts 1918, page 467, Chapter 291, Section 3—Acts 1908, page 143, Chapter 116.*—The title of the Act of 1908, page 143, chapter 116, is broad enough to cover the provision of section 3 of chapter 291 of the amendatory act of 1918 (Acts 1918, page 467) with reference to the use of affidavits in actions before a justice of the peace or a civil justice's court.

9. WORDS AND PHRASES—*"Regulate."*—The word "regulate" is very comprehensive in its scope, as is manifest from the interpretatios put upon it by the Supreme Court of the United States in casen arising under the provisions of the federal Constitution giving to the Congress power "to regulate commerce." To *regulate* is to fix or control the manner in which a thing is to be done; to prescribe a rule or method for doing it. It is comprehensive enough to cover the exercise of authority over the whole subject to be regulated.

10. STATUTES—*Title Embracing More than One Subject—Carriers— Adjusting Claims.*—To regulate the manner of adjusting claims for loss of property by a carrier is to exercise authority over the whole subject of such adjustment. The adjustment of a claim presupposes not only the existence of a claim, but some doubt or uncertainty as to its amount or its validity. There must be something to adjust, and to regulate, the *manner* of adjustment embodies the idea of determining the means or manner by which the claim may be established or disproved.

11. STATUTES—*Title Embracing More than One Subject—Adjusting Claim.*— The character of the evidence which either party may use in the

adjustment of a claim would seem to be germane to and congruous with the regulation of the manner of adjusting the claim.

Error to a judgment of the Law and Equity Court of the city of Richmond, on an appeal from the Civil Justice's Court of the city of Richmond. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Munford, Hunton, Williams & Anderson* and *Wirt P. Marks, Jr.,* for the plaintiff in error.

*H. W. Goodwyn,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This action originated in a warrant in the Civil Justice's Court of the city of Richmond. The civil justice's court rendered a judgment against the railway company for $100 and the costs, from which judgment the railway company appealed to the Law and Equity Court of the city of Richmond. In the latter court there was a trial *de novo* before a jury, and a verdict and judgment against the railway for $90 and interest and costs. To that judgment the writ of error in this case was awarded.

[1, 2] The action was to recover for damage to a carload of watermelons shipped from a point in Georgia to the consignees in Richmond, Virginia. The rights and liabilities of the parties, therfore, are not affected by section 3926 of the Code, applicable to shipments originating in this State. The watermelons arrived in bad condition, and in order to recover it was necessary for the plaintiff to show, either directly or indirectly, that they were received in good con-

dition.   This he undertook to do by showing that they
were delivered to the initial carrier in food condition.
If they were so delivered, there was a presumption
that they were in like good condition when received
by the delivering carrier, and it was liable notwith-
standing the provisions of the Carmack amendment
of the Interstate Commerce act. (U. S. Comp. St.
§§ 8604a, 8604aa.)

In *Chicago & Northwestern Ry. Co.* v. *Whitnack Pro-
duce Co.*, (April 10, 1922) 257 U. S. ——, 42 Sup. Ct.
328, 66 L. Ed. ——, it is said:   "While this court has
not expressly approved it, we think the common law
rule, supported both by reason and authority, is cor-
rectly stated in section 1348, Hutchinson on Carriers,
Third Edition—

" 'A connecting carrier, who has completed the trans-
portation and delivered the goods to the consignee in
a damaged condition or deficient in quantity, will be
held liable in an action for the damage or deficiency,
without proof that it was occasioned by his fault,
unless he can show that he received them in the con-
dition in which he delivered them.   The condition and
quantity of the goods when they were delivered to the
first of the connecting carriers, being shown, the pre-
sumption will arise that they continued in that con-
dition down to the time of their delivery to the carrier
completing the transportation and making the delivery
to the consignee, and that the injury or loss occurred
while they were in his possession.'

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"The petitioner insists that this common law rule
conflicts with the Carmack amendment to the Inter-
state Commerce act, c. 3591, 34 Stat. 584, 595, which
requires issuance of a through bill of lading by initial

carrier and declares it liable for damage occurring anywhere along the route, as interpreted and applied by this court. But we find no inconsistency between the amendment or any other federal legislation and the challenged rule. Properly understood, *Charleston, etc., Ry. Co.* v. *Varnville Furniture Co.*, 237 U. S. 597, 35 Sup. Ct. 715, 59 L. Ed. 1137, especially relied upon, gives no support to the contrary view.

\* \* \* \* \* \* \* \* \* \*

"Here there is no question of conflict between a State statute and any federal policy; and nothing in the words of the amendment indicates a legislative purpose to abrogate the accepted common law doctrine concerning presumption. The suggestion that by imposing additional liability upon the initial carrier the amendment provides an adequate remedy for shippers and thereby removes the necessity for any presumption against the terminal one and impliedly abrogates the rule, is unsound. There are adequate reasons why shippers should have the benefit of both; and we think Congress so intended."

The plaintiff filed the affidavit of the consignor, as authorized by section 3 of an act of Assembly approved March 16, 1918. Acts 1918, p. 467, ch. 291. This act amended a previous act of March 24, 1914. Acts 1914, p. 426, ch. 250. The only difference between these two acts is that the act of 1914 permitted the use of the affidavit only where the amount involved did not exceed $25.00, and the act of 1918 increased the amount involved to $300.00. The section permitting the use of the affidavit was first inserted in the statute by the act of 1914, but this act was itself an amendment of an act approved February 29, 1908. Acts 1908, p. 143, ch. 116. The validity of the last mentioned act is in no way assailed, but, on the con-

trary, is expressly admitted. The use of the affidavit in the instant case is authorized solely by virtue of section 3 of the act aforesaid of 1918.

[3] The judgment in the civil justice's court was rendered August 20, 1919, before the Code of 1919 took effect. There was an appeal to the Law and Equity Court of the city of Richmond where the case was tried *de novo* and a verdict rendered April 15, 1920, after the Code took effect. But the enactments of the session of 1918, so far as they vary from or conflict with the Code, are deemed to be subsequent to the Code. Section 6568 of the Code. The act of 1914 was carried into the Code as section 3928, but with some changes in the phraseology and omitting the clause with reference to the affidavit. The rights and liabilities of the parties, therefore, are determinable by the act of 1918, which amended the act of March, 1914.

[4] It is claimed by the plaintiff in error that the act of 1918 violates section 52 of the Constitution of this State, declaring that "no law shall embrace more than one object, which shall be expressed in its title." It is conceded in the petition for the writ of error that "the sole question involved is whether the court erred in permitting the plaintiff to introduce in evidence an affidavit for the purpose of showing the condition of the shipment when it was delivered to the initial carrier. The answer to this question depends upon the constitutionality of the act aforesaid of March 16, 1918. It is conceded, also, that, as this is an amendatory act, if the title of the original act is sufficient to embrace the matters covered by the provisions of the act amendatory thereof, it is unnecessary to inquire whether the title of the amendatory act would of itself be sufficient. *Iverson Brown's Case*, 91 Va. 762, 21

S. E. 357, 28 L. R. A. 110. It is necessary, therefore, to inquire whether the title of the original act or of the amendatory act is sufficient. The titles of these several acts are as follows: 1908—"An act to regulate the time and manner in which common carriers doing business in this State shall adjust and pay just freight charges, and claims for loss or damage to freight and claims for storage, demurrage and car service;" 1914— "An act to amend and re-enact an act entitled an act to regulate the time and manner in which common carriers doing business in this State shall adjust and pay just freight charges, and claims for loss or damage to freight and claims for storage, demurrage and car service, approved February 29, 1908;" 1918—"An act to amend and re-enact an act to regulate the time and manner in which common carriers doing business in this State shall adjust and pay just freight charges and claims for loss or damage to freight, and claims for storage, demurrage and car service, approved March 24, 1914." As practically the same descriptive language is used in all three acts we need only inquire: Is the title of the original act of 1908 broad enough to cover the provisions of section 3 of the amendatory act of 1918?

[5-7] We have so often laid down the rules for the construction of the language of section 52 of the Constitution that there is practically nothing left to be said on the subject.

In *Town of Narrows* v. *Giles County*, 128 Va. 572, 582-3, 105 S. E. 82, 85, one of the latest cases on the subject, it is said: "The constitutional provision was never intended to hamper honest legislation, nor to require that the title should be an index or digest of the various provisions of the act, and it is rare that the generality of the title is a valid objection thereto. The fact that

many things of a diverse nature are authorized or required to be done in the body of the act, though not expressed in its title, is not objectionable, if what is authorized by the act is germane to the object expressed in the title, or has a legitimate and natural association therewith, or is congruous therewith, the title is sufficient. This subject is fully discussed by Judge Riely in *Commonwealth* v. *Brown*, 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110. See also *Ingles* v. *Straus*, 91 Va. 209, 21 S. E. 490; *Commonwealth* v. *Willcox*, 111 Va. 849, 69 S. E. 1027; *Commonwealth* v. *Chesapeake & Ohio Ry. Co.*, 118 Va. 261, 87 S. E. 622; *Cochran* v. *Commonwealth*, 122 Va. 801, 94 S. E. 329; *Lucchesi* v. *Commonwealth*, 122 Va. 872, 94 S. E. 925, and cases cited. Furthermore, if there is doubt as to the sufficiency of the title, the doubt must be resolved in favor of its sufficiency, as courts will not declare an act of the legislature unconstitutional unless it is plainly so. *City of Roanoke* v. *Elliott*, 123 Va. 393, 96 S. E. 819, and cases cited. Of course the title must not be made a cover for surreptitious or incongruous legislation, nor be such as to mislead the legislature or the people, but should fairly state the general subject covered by the body of the act. *Powell* v. *Supervisors*, 88 Va. 707, 14 S. E. 543. Subject to these limitations, the generality of the title is not a valid objection."

[8] Nothing remains to be done now but to test each case by the rules heretofore laid down. In the case in judgment, is the title of the act of 1908 broad enough to cover the provision of section 3 of the act of 1918 with reference to the use of the affidavit? That title is: "An act to regulate the time and manner in which common carriers doing business in this State shall adjust and pay just freight charges, and claims for loss or damage to freight and claims for storage, demurrage

and car service."   The amendment consists of the addition of section 3, which is as follows:

"3. In any action which may be instituted pursuant to this act before a justice of the peace, or a civil justice court for an amount not exceeding three hundred ($300.00) dollars, either party at or before the return day of the warrant may file an affidavit relating to the subject matter and the other party to such action shall have a right of continuance for a reasonable time; provided, that any party to such warrant may give reasonable notice to the party filing such affidavit and take the deposition of the affiant or affiants, at such time and place as the court may prescribe, the taking of such deposition to be governed by the rules of law in force regarding the cross-examination of witnesses. Such affidavits and depositions shall be read with the same force and effect as if taken in the form of a deposition after due notice to the other party.   In the event of appeal of any such action such affidavits and depositions shall be read in the appellate court with the same force and effect as in the civil justice court, or before the justice of the peace."

[9-11] It will be observed from the title of the act that it is a regulatory statute.   The word "regulate" is very comprehensive in its scope, as is manifest from the interpretation put upon it by the Supreme Court of the United States in cases arising under the provisions of the federal Constitution giving to the Congress power "to regulate commerce."   Black's L. Dict., "Regulate."

To *regulate* is to fix or control the manner in which a thing is to be done; to prescribe a rule or method for doing it.   It is comprehensive enough to cover the exercise of authority over the whole subject to be regulated.   4 Words and Phrases (2d ed.), 234.   To

regulate the manner of adjusting claims for loss of property by a carrier is to exercise authority over the whole subject of such adjustment. The adjustment of a claim presupposes not only the existence of a claim, but some doubt or uncertainty as to its amount or its validity. There must be something to adjust, and to regulate. The *manner* of adjustment embodies the idea of determining the means or manner by which the claim may be established or disproved. Section 3 of the act complained of gives to either party the right to file "an affidavit relating to the subject matter" and the other party is given the right to a continuance for a reasonable time, and also to take the deposition of the affiant after reasonable notice. The carrier is required to adjust and pay the claim within sixty or ninety days, as the case may be, after the filing of such claim in the manner required by the statute. He may resist liability, and, in so doing, may use affidavits as provided by the statute. So likewise the claimant may use affidavits in establishing his claim. The character of evidence which either party may use in the adjustment of the claim would seem to be germane to and congruous with the regulation of the manner of adjusting the claim. It is true that the title is to regulate the manner in which the *common carrier* shall adjust, etc., but in regulating the rights and duties of the common carrier, the rights and duties of the shipper are necessarily affected, and what affects the latter must be germane to what affects the former.

In *Westgate* v. *Town of Adrian*, 161 Mich. 333, 126 N. W. 422, the title of the original act, passed in 1887 (Pub. Acts Mich. 1887, No. 145), was "An act to regulate the use of steam engines, steam wagons or other vehicles, which are, in whole or in part, operated by steam, on the public highways of this State, and to

prohibit the blowing of steam whistles upon the public highways of this State." In 1903 (Pub. Acts Mich. 1903, No. 71) the body of the original act was amended by providing, "that no township shall be liable for any damages sustained by the breakage of any bridge or culvert by any steam engine or steam vehicle, weighing more than six tons." The plaintiff was the owner of a steam traction engine, used by him to provide power to run a threshing machine or grain separator. When moving from farm to farm the plaintiff usually hitched the separator behind the engine, which furnished the power to propel itself and to haul the separator. The engine, when supplied with the water necessary for its operation, weighed approximately eight tons. On September 9, 1907, while moving the engine over a bridge located upon one of defendant's highways, the bridge collapsed, permitting the engine to fall through and become damaged. A directed verdict was found for the defendant, and the plaintiff appealed. It was contended on behalf of the plaintiff that the title of the act was not broad enough to cover the matter embraced in the amendment, and was, therefore, in violation of a constitutional provision similar to the one under consideration. It was held that the title in question was broad enough to cover the subject matter of the amendment. In the course of the opinion, it was said: "It will be noted that the original title contains the word 'regulate.' Under the term, very broad powers may be exercised. It means both government and restriction. *Dillon* v. *Railroad Co.*, 43 N. Y. Supp. 320; *City of Rochester* v. *West*, 164 N. Y. 510 (58 N. E. 673, 53 L. R. A. 548, 79 Am. St. Rep. 659); *McWethy* v. *Power Co.*, 202 Ill. 218 (67 N. E. 9).

"Any provisions germane to the subject expressed

in the title may properly be included in the act, or added thereto by amendment. It is sufficient if the title fairly expresses the subject, or is sufficiently comprehensive to include the several provisions relating to or connected with that subject."

In *Jonesboro City* v. *Cairo & St. Louis R. R. Co.*, 110 U. S. 192, 4 Sup. Ct. 67, 28 L. Ed. 116, the title of the act was, "An act to amend the charter of the Cairo & St. Louis Railroad Company," and the body of the act contained a provision validating a prior election held in the city of Jonesboro authorizing a bond issue by the city as a subscription to the stock of the railroad company, and it was held that the title of the act was broad enough to cover the validating section. In the course of the opinion it is said: "The authority of municipalities to make subscriptions in aid of the construction of railroads in Illinois has frequently, if not generally, been given in the charters of the respective railroad corporations. Whether a particular municipality has legislative authority for a subscription to the stock of a particular railroad company can be determined, ordinarily, by referring to the charter of that company. The general subject of municipal subscriptions to the stock of this particular company was, therefore, germane to and fairly embraced by the title of the act of 1869. Upon like grounds a provision in the same act legalizing a previous election at which the people voted in favor of a subscription and giving authority to issue bonds for the amount indicated by the popular vote, was sufficiently covered by a title showing that the act in question was amendatory of the original charter of the company; this, because the validity of bonds so issued would depend upon the existence of legislative authority to issue them, and the existence of such authority

would ordinarily be ascertained by reference to the charter and amended charter of the railroad corporation." See also *Detroit* v. *Detroit Citizens' St. Ry.* 184 U. S. 391 22 Sup. Ct. 410, 46 L. Ed. 592; *Blair* v. *Chicago,* 201 U. S. at p. 451-2, 26 Sup. Ct. 427, 50 L. Ed. 801; *Montclair* v. *Ramsdell,* 107 U. S. 147, 2 Sup. Ct. 391, 27 L. Ed. 431, 35 Am. & Eng. Anno. Cas. 84.

A number of cases from this and other jurisdictions have been cited upon the sufficiency of titles of acts to cover matter embraced in the enactments, but it is unnecessary to review them as they are only valuable as illustrations. The sufficiency of the title of each act must be determined from a consideration of its title and the body of the act under established rules of construction.

We are of opinion that the title of the original act of 1908 is broad enough to cover the amendment made by the act of 1918, and that the judgment of the trial court so holding should, therefore, be affirmed.

*Affirmed.*